James B. M. McNally, J.
This is a motion for an order directing a new trial upon the ground of newly discovered evidence. The original trial was had before Mr. Justice Walter, who is now serving as an Official Beferee. He is disqualified by reason of retirement from passing on this motion.
The case has been passed upon by our Court of Appeals, which affirmed the judgment rendered by Mr. Justice Walter. The nature of this case and the issues presented and decided are set forth in Edelman v. Frindel (309 N. Y. 935, 936): “ The complaint in a derivative stockholder’s action alleged that 123 Cedar Street Corporation orally agreed with one Elias A. Cohen, decedent, to ‘ invest ’ $50,000 of said corporation’s money in the purchase of said real property known as 111-115 Broadway; that, at the time of said agreement, plaintiff and Elias A. Cohen, the decedent, each owned 45% of the capital stock of 123 Cedar Street Corporation; that Princeway Bealty Corporation, a corporation wholly owned by said Cohen, contracted to purchase said property from Trinity Buildings Corporation, which property was eventually bought and held by said 111-115 Broadway Company, Inc., which has not issued shares of stock to 123 *770 Cedar Street Corporation, although duly demanded, to evidence said ‘ investment ’, and that said 111-115 Broadway Company, Inc., was controlled by decedent. There was evidence that such sum of $50,000 was entered oh the accounts of 123 Cedar Street Corporation as a 1 loan ’ and regarded as such in various other writings, including an income tax return signed by appellant himself. In dismissing the complaint, Special Term stated that the evidence failed to establish the claimed agreement. In the Court of Appeals respondents argued that appellant had failed to establish the alleged agreement; that appellant’s testimony as to the alleged agreement with decedent was barred by section 347 of the Civil Practice Act, and that the agreement was void under the Statute of Frauds.”
Plaintiff, Samuel Edelman, claims that on April 10, 1956 he received from one Ralph Masucci a writing purporting to be a letter addressed to the plaintiff under date of October 8, 1951. Plaintiff claims that he did not know Masucci at the time of the original trial, but has met him since in connection with a real estate deal. Masucci, in an affidavit attached to the moving papers, asserts that in June of 1952 the decedent, Elias A. Cohen, placed in his care for safekeeping, to be returned to him when he came back from Europe, certain cartons containing many papers. He claims that in the early part of March, 1956 he told Mr. Edelman about the letter; that some time in April, 1956 Masucci gave Mr. Edelman the letter.
At the trial a witness named Marie Bellotte was called by the plaintiff. She claims that she first met the plaintiff in 1953. After the trial Miss Bellotte made claim against the estate of Elias A. Cohen, claiming that she was Cohen’s common-law wife. The defendants assert that she found support in this rOaim from Masucci. Further, Masucci claims he has a claim against the estate of Elias A. Cohen for an alleged advancement of $35,000. Masucci claims that for this alleged advancement of $35,000 he received the promise of Cohen to repay Tiim, within five years, 10 times that sum, or $350,000.
Masucci is an ex-convict, having been convicted on his own plea in a Federal court of falsely making, forging and counterfeiting obligations and securities of the United States. Masucci claims that the letter in question was found in a carton entrusted to him by the decedent. Assuming the genuiness of the alleged letter, newly discovered, and assuming that a proper foundation was laid for its admissibility into evidence, the question presented is whether or not it would bring about a different result in the ultimate determination of the litigation, The *771 alleged letter is dated October 8, 1951. ' In the brief filed on behalf of the executors in the Court of Appeals it was pointed out (references are to folios in Court of Appeals record):
According to plaintiff the parties had not reached an accord as late as the middle of April, 1952, when the last conversations allegedly were had before decedent sailed for Europe where he passed away. They- were then arguing about the matter of interest, plaintiff complaining that the 12% which he says decedent suggested, was “not fair” (512-513). Admittedly, up to that time, the amount of shares to be allotted had neither been discussed nor agreed upon (736-738).
The acquisition of the properties, as previously noted, entailed substantial financing, the posting of substantial collateral and the giving of personal guarantees by decedent. * * * Plaintiff claimed that the decedent stated he would take care of the financing (395-399), but testified also that he was asked by the decedent whether he would obligate himself personally in connection therewith, and said that he would (407). However, he admitted that he never saw any papers in connection with any of the loans or mortgage transactions, and professed complete ignorance about the Standard Factors Loan, which required the posting of heavy collateral (432, 668-669).
A complete and valid oral agreement would necessarily have embraced an understanding as to these vital matters.
The cryptic memorandum on the back of an envelope (assuming the admissibility thereof over the stated objection ‘that conversations with the decedent in violation of § 347 are used as a basis to mahe the document admissible’ [366, 515-516]), that plaintiff claims he received just a few weeks before decedent’s departure for Europe, would, indeed, in and of itself indicate the lack of accord that existed even at that late date (507-514; 1599, pltff’s exh. 75) (pp. 43-44).
Plaintiff claims that he spoke to decedent “ just a few weeks before ” decedent left for Europe (507). Decedent’s European trip was on June 11, 1952 (736). He died shortly thereafter, on July 2, 1952 (19). They met at a restaurant for dinner, plaintiff claims, to “ discuss the stock for 111, and things in general” (508). It was on that occasion that plaintiff claims he received the memorandum written on the back of an envelope (pltff’s exh. 75; 508-516). Decedent is supposed to have said with respect to the memorandum “here, this takes in everything as far as you and I are concerned” to which plaintiff replied “ what do you mean, it takes in everything ” (509). Decedent pointed out, according to plaintiff, “ there are moneys which some of his corporations owed me personally which he did not want to pay any interest on” to which plaintiff rejoined “I don’t see why I shouldn’t get interest. Those moneys were due in 1948 and it has not been paid” (510), to which decedent commented “I should forget about the interest because after all he took me in on a good deal” (510). Plaintiff then stated “you took me in on a good deal! In the meantime I have not even got the stock” (510), to which decedent allegedly remarked “don’t worry, you’ll get it” (510). (Pp. 33-34).
The executors’ brief continued:
It was at this juncture that plaintiff claims he received the memorandum which was allegedly accompanied by decedent’s observation, “ this takes in our complete transactions, to clear everything up” (511). Plaintiff says he observed on the bottom of the memorandum the notation “12 per cent on all *772 sides” and asked decedent “what does it mean?” (512). Decedent allegedly explained that “ ‘ Cedar Street Corporation will get 12 per cent on the $50,000 which it invested in 111 Broadway and he said he would get 12 per cent on $225,000 which he put in on Ms own” (512). Plaintiff’s reply was “ ‘ That’s not fair at all. You want 12 per cent because you put in $225,000 but you don’t want to give me six per cent on my money. It’s not fair ’, I said to him ” (512). Thus in the final conversations had with the decedent prior to the latter’s death according to plaintiff they were still arguing as to the rate of interest on the $50,000.00 obligation, but, reached no accord even on that score (512). Plaintiff said “I don’t even know whether you put in $225,000. I keep asMng you for figures and you tell me, ‘ don’t worry. Everything will be straightened out’” (513). Decedent replied “the accountants will go through from the time the property was purchased, they will go through from the beginning and give you all the figures ” (513). (Pp. 34-35.)
The foregoing quotations indicate that Edelman’s own testimony negates any idea that an oral agreement was arrived at, as claimed by him, at or before October 8, 1951, the date of the alleged newly discovered letter. On the contrary, Edelman’s own testimony was that he received a written memorandum in the handwriting of the decedent a few weeks before the latter left for Europe, which was on June 11,1952, which memorandum was received in evidence on the trial and which memorandum, as the executors pointed out to the Court of Appeals, was to the effect that the parties, up to the time that decedent left for Europe in June of 1952, had reached no record.
The following testimony has .particular reference to conversations that took place between Edelman and the decedent long after the purported letter of October 8, 1951:
Q. Well, in any event, you are sure, are you not, that in that talk which was had when the accountants and your lawyer were present, there was nothing said about the number of shares that you wanted allocated or transferred, isn’t that correct? A. At that discussion it was not discussed.
Q. And as a matter of fact you did not come down to any exact figure up to that time at all, isn’t that your statementf A. That is correct. (737-738). (Brief, p. 35.)
The following indicates plaintiff’s claim was personal in nature:
Plaintiff * * * testified * * * “I want my stock on everything because I am not getting anywheres ” (471). In another conversation plaintiff testified he allegedly told decedent: “now, I have been very patient but I cannot wait any longer. I want my stock ” (485); and still in another conversation: “how about my stock? How about my stock?” (494); again: “ just give me the stock on 111 and later on we will see about the other properties ” (496). (Brief, pp. 35-36.)
The following bears on formal agreements: On October 20, 1948 plaintiff received a promissory note from the decedent in conformity with the agreement of that date (705-706; defts ’ *773 exh. F). Plaintiff’s counsel, in offering in evidence plaintiff’s exhibit 88, the formal agreement made simultaneously with defendants’ exhibit D and referred to therein (808-809), claimed that it furnished a “pattern” as to the course of conduct of the parties (809).
‘ ‘ the court : What it suggests in my mind is that if they had Cedar Street in mind, why didn’t they put it down?
‘ ‘ mr. rothschild : Cedar Street was always kept open because, as to Cedar Street, he refused to do business until he settled with Miller.
‘ ‘ the court : If you really mean that statement, that in itself kills your case ” (813).
Moreover, there were further contemporary documents. On July 15, 1948 plaintiff had received a promissory note from the decedent for $17,100 (785-786; defts’ exh. J). The agreement of September 28, 1948 (defts’ exh. D) covered the same obligation. Plaintiff was in possession of both the note and the agreement.
From the above it is seen that it was the executors’ contention that plaintiff’s claim as to the existence of an alleged oral agreement was repudiated by formal contracts that came into existence after the oral agreement was allegedly made, and the executors argue, since formal agreements were consummated with respect to matters of comparatively lesser importance, that could only have meant that the parties had not reached any agreement such as the plaintiff asserted with respect to 111-115 Broadway.
In the court’s opinion, on a new trial the letter of October 8, 1951 could not produce a different result. At best, its sole purpose would be to corroborate the plaintiff in his claim that there was an oral agreement under which either 123 Cedar Corporation or the plaintiff would be entitled to a proportionate proprietary interest in 111-115 Broadway or in the stock of the corporation holding title to these properties.
Masucei apparently has testified under oath that whatever was contained in the cartons, including the alleged letter, was to be returned to the decedent, and such allegedly were the instructions that he received. The Trial Judge ruled that plaintiff’s testimony as to alleged oral agreements with the decedent was inadmissible; such testimony on the part of the plaintiff would still be inadmissible if a new trial were had. Newly discovered evidence, to justify awarding a new trial, must be positive and convincing. The fundamental and underlying test to be applied to a motion of this character is whether the newly *774 discovered evidence is of such a nature and is so positive and convincing that it will, in all probability, produce a different result if a new trial is had (Collins v. Central Trust Co., 226 App. Div. 486; Travitzky v. Schamroth, 277 App. Div. 1018). The alleged letter of October 8, 1951 does not meet this test.
Accordingly, the motion for a new trial is denied.