In the Matter of the CITY OF NEW YORK (UNION TURNPIKE).*

Supreme Court, Queens County, December 31, 1934.

* Affd., 243 App. Div. 811.

*Paul Windels, Corporation Counsel* [*Arthur H. Indell* and *Isidor Bleich* of counsel], for the city of New York.

*Skinner & Bermant, Nathan L. Goldstein, Edward W. Murphy, Roe & Kramer, Talley & Lamb, Ferris & Kuh* and others, for the claimants.

LOCKWOOD, J. This is an application to vacate a notice for examination before trial served by the city of New York to take the testimony of over one hundred witnesses on January 2, 3, 4, 7, 8, 9, 10 and 11, 1935.

This proceeding, instituted May 22, 1931, affects 499 damage parcels and subdivisions acquired by the city of New York for the laying out and construction of Grand Central parkway from Austin street west of Queens boulevard at Kew Gardens to the Nassau county line, a distance of about seven miles.

Title vested in the city June, 1930, and June, 1931, to a few parcels, the remainder on July 21, 1931.

Testimony was taken at Special Term, Jamaica, between November 16 and December 11, 1931.

Tentative awards were made as to the property originally taken on February 15, 1933, and as to the additional taking on October 21, 1933.

The tentative decree was signed and filed July 18, 1934.

Hearings on objections were set for November 8, 1934; adjourned, and are now to be heard January 14, 1935.

The tentative awards amount to $6,216,697.48.

The moving parties claim that the notices of examination before trial should be vacated on the ground that the trial of the proceedings terminated with the signing and filing of the tentative decree; that thus the city had its day in court and ample opportunity to present any and all evidence available.

The corporation counsel contends:

(1) That this motion to vacate his notice of examination should be denied because this is not an ordinary action between a plaintiff and a defendant, but is a condemnation proceeding which is still pending; that the hearing on objections is in effect a separate trial, and a court sitting to condemn land for public use is untrammeled by technical rules of evidence and unrestricted as to its sources of information as to value.

(2) That he is entitled, as a matter of right, to produce evidence to sustain the objections to the tentative decree and to an examination to secure said evidence.

(3) That it has been the custom on the trial of condemnation proceedings to permit the taking of testimony on the hearing of

objections to a tentative decree; that some of the attorneys here supporting the motion to vacate the notice have themselves offered such proof in other proceedings and have given notice in this very proceeding of their intention to offer further and additional proof on the hearings of objections to this tentative decree.

(4) That he is entitled now to obtain the proof sought and to submit the same to the court on the hearing of objections to the tentative decree under the provisions of the legislation passed by the Legislature in 1932 after the investigation into the conduct of condemnation proceedings made at the request of the city authorities, to wit, chapter 391 of the Laws of 1932, amending the Greater New York Charter; also pursuant to section 1002 of the Greater New York Charter, and article 29 of the Civil Practice Act, sections 288, 290, 292 and 293.

(5) That if given the opportunity he will show facts with respect to actual sales of property taken and of property comparable to that taken in this proceeding which, if made known to the court, will justify and result in the reduction of the awards herein by several millions of dollars; that he will show that certain alleged sales relied on by the experts as a basis of forming their opinion and offered as proof by claimants herein were, in fact, fictitious sales; that he will offer proof as to one hundred and thirty-seven sales, one hundred and seven of which were a part of damage parcels taken herein by the city and to which title vested in the city herein on or before July 31, 1931, the majority of which sales were made — in the good years prior to the fall of 1929 — at prices far below the amount awarded herein.

(6) That in view of the large amount involved, $6,216,697.48, in awards, plus interest of about $1,200,000, which sum must be paid by the taxpayers of Queens borough and of the city of New York, the matter is of great public importance.

As to the corporation counsel's first contention, it is well settled that a condemnation proceeding is a special proceeding. Section 1000-b of the charter of Greater New York so provides. In fact it is a proceeding broad in scope.

The latitude of the court in taking evidence as to sales bearing on market value was well stated in *Matter of City of New York (Jennings Street)* (207 App. Div. 170). The court, per McAvoy, J., said (p. 170): " While the court, sitting to condemn land for a public use, is untrammelled by technical rules of evidence and unrestricted as to its source of information as to values, and should be guided by its own judgment and experience rather than by the opinions of expert witnesses, yet the court must consider relevant evidence on values in the vicinity as established by sales of similar properties

and the prices paid for the very land itself within a not too remote period from the date of the vesting of title in the city."

As to the corporation counsel's second contention that he is entitled as a matter of right to secure evidence by examination and produce it on the hearing of objections to the tentative decree, he relies upon *Matter of Mayor (Cromwell Avenue)* (95 App. Div. 514), construing the section of the old charter containing practically the same provisions as new section 1002, where the Appellate Division, First Department, in a unanimous opinion, written by Mr. Justice INGRAHAM, said in part: " The appellant having objected to the preliminary abstract of the commissioners, was undoubtedly entitled to produce evidence to sustain the objection."

As to the third point, a glance at the records in but a few of the condemnation proceedings recently conducted in the Second Department shows that the claim of the corporation counsel, that it is the custom to permit the taking of testimony on the hearing of objections to tentative decrees, is well founded.

On September 25, 1934, Mr. Justice MAY, on the hearing of objections to the tentative decree in *Matter of Braddock Avenue,* permitted the city to offer reappraisals and testimony of witnesses in support thereof, affecting a large number of parcels.

In *Matter of Depot Road,* attorneys, who in this proceeding have made a motion to dismiss the notice for examination before trial in this proceeding returnable in Kings county, made a motion to offer further proof on the hearing of objections to the tentative decree and have contended in their brief " that the right here exists on the part of those assessed, having duly filed objections to the tentative award," to an examination before trial. That is before the hearing on the objections to the tentative decree. Although opposed, the order allowing the examination before trial, after the tentative decree and before the hearing on objections to the same, was granted by Mr. Justice Faber of this court on July 6, 1933; and pursuant to said order new evidence was obtained, offered and received. Thus the same question raised here was there presented and decided as the city here contends.

In *Matter of City of New York Public Beach (Jacob Riis Park),* a motion was made by city of New York to submit additional proof to the court.

In his opinion (N. Y. L. J. March 21, 1931) Mr. Justice DUNNE said in part: " in view of the claim of the city on this motion the court in the interest of justice has decided to take such further evidence of value as the city may see fit to offer on such parcels as it may desire, with the right to the property owners affected to offer further evidence on the same point."

Thereafter, in the *Public Beach (Jacob Riis Park)* case much additional evidence was taken, resulting in a large reduction of the awards made, and a saving to the city of New York, in awards and interest, of upwards of $4,500,000.

Here the corporation counsel states that his purpose is to have before the court upon the hearing of objections all the factual proof necessary in substantiation of the claims made by the city of New York for the correction of the awards, which proof was not before the court prior to the tentative decree as sworn, testimony by reason of the fact that no method of bringing the proof before the court appeared to be then available to the city of New York.

In this proceeding the total tentative awards for 499 damage parcels and subdivisions were $6,216,697.48.

In the *Public Beach (Jacob Riis Park)* matter tentative awards were about $12,500,000 and after taking of testimony and other newly-discovered evidence, were reduced by the trial judge to about $9,000,000.

As to the fourth contention:

Prior to the enactment of chapter 391 of the Laws of 1932 it seemed that direct evidence as to sales of property similarly situated, as a basis for the value of property acquired, could not be introduced in evidence.

Chapter 391 of the Laws of 1932 was the result of an investigation into condemnation proceedings conducted for the city of New York by the Hon. Leonard M. Wallstein, special assistant corporation counsel. In his report dated January 28, 1932, he says, among other things: " Under a dubious application of certain judicial utterances, the determination of just compensation revolves almost wholly around the so-called real estate ' expert.' Awards are chiefly based upon the opinions of these experts and such opinions are often in the highest degree haphazard and irresponsible, if not worse. Their influence in determining the liability of the city is indicated by the results in condemnation cases over a period of years.

" The existing method of valuing land, acquired by condemnation by the city of New York, is extravagant, wasteful, unfair to the city, frequently unfair to the private owner and beneficial to nobody except a favored [few].

" Since the front door is closed to direct evidence of facts, claimants' attorneys make a practice of contributing assertions and assumptions to the record in order to introduce ' evidence ' of sales by the back door. If a witness states that he does not know of a particular sale, as to which he is cross-examined, the attorney

will ask him to ' assume ' that the sale took place at a given price, and the price thus named is often grossly exaggerated or misleading. The pretext for this is to test the credibility of the expert; actually its purpose is to get an alleged sale price before the court. The assumption or assertion by the attorney is, of course, an unsworn statement, and the conclusion is inescapable that this gross abuse is often deliberately designed by counsel to inflate awards.

" In short, the trial practice in condemnation proceedings is utterly lacking in method for disclosing essential information to the court, and in the usual safeguards against the introduction of incompetent evidence. Hearsay evidence is not only introduced, but invited and relied upon. Opinion evidence which has, in other classes of litigation, received judicial criticism, is the accredited and, in addition to hearsay, the only record basis for the determination of just compensation. Perhaps in no other field of the law is the trial judge so completely helpless to learn the truth. Certainly in no other field is the way so clear and the temptation so inviting to unscrupulous, shrewd and safe device for preventing the court from arriving at the truth.

" * * * Gossip and rumor become the accepted standard of value and the wildest kind of estimates may be ' justified ' on the basis of what a witness may say he has heard or been told by somebody else. Such a procedure enables speculators to thrive in the certainty of the court's ignorance of the truth. It makes possible the manipulation of the indicia of value so as to mislead and deceive the court. Sales may be ' washed ' and rigged with impunity. It is inevitable that with such irresponsible methods of ' establishing ' value, condemnation awards should often be amazingly in excess of estimated cost and commonly known value. * * *.

" A large majority of the jurisdictions, which have passed upon the subject, have expressly repudiated the rule of evidence accepted and slavishly followed in New York as governing condemnation trials. These jurisdictions hold that the best evidence of the fair market value of land is that derived from the *bona fide* sales of similar property in the vicinity. This is the so-called ' Massachusetts rule.'

" The recommendation of the report is that the Massachusetts rule be enacted by law to govern condemnation proceedings brought by the City of New York. To assist in its application, and to assure that the actual facts be made available for the guidance of the court, the recommendation is that a further statute be enacted, which will adapt to condemnation proceedings the usual

process of examination before trial, which, in other classes of litigation, has been so effective in eliciting the truth."

Thereafter, upon the coming in of the Wallstein report, the city authorities appealed to the Legislature, pointing out the evils of this practice and the excessive awards which were often made because the court did not have the benefit of the true facts before it, and the remedial legislation was passed.

In the conduct of this investigation the Court of Appeals of this State, in *Matter of Edge Ho Holding Corp.* (256 N. Y. 374), which was an application to resist a subpœna for the examination of a claimant by the commissioner of accounts, said (at p. 378): " We think an inquiry as to the price paid to former owners for land condemned within a period of time not unreasonably remote is fairly related to an inquiry into the efficiency of the methods by which condemnation proceedings are conducted in the offices of the city government responsible therefor. In such proceedings as in lawsuits generally the courts must rest their determination on the evidence exhibited by counsel. They are helpless, except in rare instances, to speak the word of truth if the facts are not uncovered for them. It results that the efficiency of any system of awards for land condemned depends in no small measure upon the diligence and skill with which the case has been prepared. The inquisitor in the pending investigation has in mind to show that awards have been swollen in excess of the market values, and that this has been done without scrutiny of the cost and without attempt to prove it by witnesses easily available."

This Grand Central parkway proceeding was tried in 1931, before the new statutes were enacted, under the adverse condition just referred to and thus the city was at a great disadvantage. Now before it is too late the corporation counsel seeks to turn on the light which he asserts will bring out facts showing clearly that the awards are largely in excess of the fair and reasonable market value.

The courts have decided that the remedial statutes apply to pending proceedings (See opinion of Mr. Justice HUMPHREY, *Matter of City of New York* [*Ninth Ave.*], N. Y. L. J. June 7, 1932), so that facts which the corporation counsel could not heretofore present to the court may now be presented in a pending proceeding.

Section 1002 of the Greater New York Charter provides, among other things, as follows: " Upon the filing of the tentative decree   *   *   *   that the city of New York and all other parties interested in such proceedings, or in any of the real property affected thereby, having any objection thereto, shall file such objections, in writing,   *   *   *   and that the corporation counsel   *   *   *

will apply to the justice who made the tentative decree to fix a time when he will hear the parties so objecting. * * * At the time fixed, the justice shall hear the person or persons who have objected to the tentative decree, or to the new, supplemental or amended tentative decree, * * * and shall have the power to adjourn from time to time until all parties who have filed objections and who desire to be heard, shall have been fully heard. After the filing of the tentative decree, or of any new, or supplemental, or amended tentative decree, no award for damages shall be diminished nor any assessment for benefit increased, without notice to the owner of the real property affected or his attorney appearing in the proceeding and an opportunity given for a hearing in regard thereto before signing the final decree."

We should note the provision that the hearing is to continue " until all parties who have filed objections and who desire to be heard shall have been fully heard." Surely the city which " desires to be heard " has not " been fully heard " until and unless it is given a reasonable and adequate opportunity to secure and present evidence of the greatest importance bearing on the awards it is to be called upon to pay.

Sections 288, 290, 292 and 293 of article 29 of the Civil Practice Act provide for the taking of testimony by deposition during pendency of actions and before trial, by notice or by order.

Chapter 391 of the Laws of 1932 added a new section reading in part as follows: " § 1000-b. A proceeding by the city of New York to acquire title to real property for a public use or purpose by condemnation shall be deemed a special proceeding, in which testimony may be taken by deposition pursuant to the provisions of article twenty-nine of the civil practice act and the rules of civil practice and subject to the provisions of this section. The pendency of such a proceeding shall constitute special circumstances which render it proper that the deposition of any person not an owner be taken, pursuant to section two hundred and eighty-eight of the civil practice act. Such deposition may be taken upon any question or issue in the proceeding and for the purpose of obtaining testimony as to any sale or lease as described in section one thousand-a, at the instance of the city of New York or of any owner or at the direction of the court at any time after the expiration of the time fixed for filing claims."

Section 288 provides the authority for the examination. Section 290 provides for the giving of notice. Section 292 provides for securing an order for examination. Section 293 provides for an order for examination during trial or after judgment to carry it into effect.

As to the question of procedure here raised, section 105 of the Civil Practice Act meets the situation.

Section 105 provides:

" Mistakes, omissions, defects and irregularities. At any stage of any action, special proceeding or appeal, a mistake, omission, irregularity or defect may be corrected or supplied, as the case may be, in the discretion of the court, with or without terms, or, if a substantial right of any party shall not be thereby prejudiced, such mistake, omission, irregularity or defect must be disregarded."

The court in *Wertheim* v. *Grombecker* (229 App. Div. 16, at p. 18) said: " It is true that those words were not used, but the record discloses that the evidence is material and necessary and it is proposed to use the depositions on the trial, and we will not reverse on the ground of informality or irregularity where the rights of the defendants are obviously not prejudiced. (Civ. Prac. Act, § 105.) That these provisions of the new practice act should be liberally constructed is now a well-accepted doctrine."

Here the rights of claimants surely cannot be prejudiced by bringing out all the facts.

Furthermore, rule 124 of the Rules of Civil Practice provides in part: " If the court or judge who hears the motion shall deem that the testimony sought to be taken is not material or necessary for the party who served the notice, or for any reason that the interests of justice would not be subserved by such examination, an order may be made vacating and setting aside the notice to take the testimony or limiting the scope of the examination."

The court is of the opinion that the proof which the corporation counsel here seeks to obtain and put before the learned trial court and into the record in this case is material and necessary and will serve the interests of justice and may result in large savings to the city of New York and to the property owners upon whom the cost of this great undertaking will be assessed.

It is well known that during 1930 and 1931 and subsequent years the city authorities have in a great many cases refused to lower assessed values. Therefore, why should the court refuse to permit the corporation counsel to show as he claims that the tentative awards here are many times the assessed values of the parcels taken either in whole or in part?

Assessed values are now received as some evidence of market value.

As to the fifth contention of the corporation counsel, that he will show facts relating to actual sales of property taken and of property comparable to that here taken, which should justify and result in substantial reductions of the tentative awards herein by

several millions of dollars, this court, in the few days allotted for the consideration of this motion, has caused to be prepared and annexed hereto a chart of the 137 sales offered, giving the year of the sale, the consideration, the total area, part taken, the remainder, the damage parcel number, the assessed valuations in whole and part, the claimants' estimate of value, the city's estimates of value heretofore submitted, the court's award, and other data.

From this list the corporation counsel has had prepared and there is incorporated here in detail, data as to only a few of the parcels. These few convince this court that the proof offered is so material and necessary to the interests of the city and to the court on the trial of this proceeding that all of the information should be received and considered, and the fullest opportunity offered for supporting proof and data, all to the end that the interests of justice may be served.

DAMAGE PARCELS 1, 1A, 2, 2A, 3, 3A, 4, 6, 6A, 7, 9, 9A and 10.
(Map or diagram omitted.)
*Takings.*

|  | | Square feet. |
|---|---|---|
| **1.** June 1, 1931 | | 7,282 |
| **2.** July 27, 1931 | | 7,318 |
| **3.** August 1, 1932 | | 3,673 |
| Total area taken | | 18,273 |

*Awards in This Proceeding.*

| | |
|---|---|
| 1. Land only | $70,000 |
| 2. Land, $140,000; building, $2,800 | 142,800 |
| 3. Land, $30,000; building, $5,000 | 35,000 |
| Total awards | $247,800 |

There was very little damage to the building for which the court allowed $7,800. The city's estimate was $1,100.

*Assessed Value Entire Property, 1931.*

| | |
|---|---|
| Land (all) | $178,500 |
| Building (all) | 23,000 |
| Total | $201,500 |

*Pro rata* assessed value of land taken, $35,186.

Court's tentative award for land taken, $240,000, or nearly eight times the assessed value.

In other words, the owner of property in a residential zone is awarded $7,800 for slight damage to a building estimated by the city to be $1,100 and $240,000 for one fourth of land assessed at $175,000. Thus he has three-fourths of his land and the building left and awards of $247,800.

CITY SALE No. 1, QUEENS LIST.

(Map or diagram omitted.)

Total area before taking, 17,219 square feet; area taken, 5,500 square feet (about one-third of the plot).

The city will show sales as follows:

January, 1929, Kew Gardens Corporation to Goldberg, vacant, for $120,000.

May, 1929, Goldberg to Cadmus Holding Corporation for $160,000.

June, 1930, Cadmus Holding Corporation to Central Steinway, vacant, $118,000.

Construction of building for Central Steinway Corporation, the claimant herein, summer of 1930 at a cost of $66,000.

Total cost to claimant, land and building, $184,000.

*Assessed Value for the Year 1931.*

| | |
|---|---|
| Land | $65,000 |
| Improvement | 20,000 |
| Total | $85,000 |

The court's tentative award here for one-third of the land and partial damage to building is $170,000.

That real estate values here fell rapidly after the fall of 1929 and that the court proposes to award as of 1931 when values were low about what the entire property cost the year before, and still the owner would have left two-thirds of the land and the remodeled building.

CITY SALES Nos. 3 AND 4, QUEENS LIST.

Here a strip eighteen feet wide was taken. It affected the lawn along the Union turnpike frontage and necessitated the entrance steps being built into the open courtyard.

(Map or diagram omitted.)

The city will show:

That the two apartment houses with the land were sold when new in 1923 for $800,000.

That in 1929 the claimant, holder of a mortgage, purchased the property for about $500,000.

That the assessed value for both properties in 1931 was

| | |
|---|---:|
| Land | $185,000 |
| Buildings | 431,000 |
| Total | $616,000 |

The award for the 5,349 square feet, a little less than three 20 x 100 city lots, one-ninth of the total plot, is $140,000, with slight damage to the improvements.

The owner protested the 1931 assessed value and, under oath, swore that the value of the Kew-Kensington did not exceed $210,000 and that the assessed value of $388,000 for the Kew-Arlington was entirely too high.

### SALES NOS. 6 AND 7, QUEENS LIST.

(Map or diagram omitted.)

The corporation counsel contends that as to this property, for one-seventh of which the court made a tentative award as of the low real estate market of July, 1931, of $157,000, he will show:

The entire vacant parcel was sold June 1, 1926, by Boimer to Van Cortlandt Organization, for $375,000.

The purchase price was, first mortgage, $60,000; second mortgage, $240,000, and $75,000 in cash.

That on April 18, 1929, the Van Cortlandt Organization conveyed the property to one Dempsey for a claimed consideration of $706,875. Arranged as follows: First mortgage, $190,000; second mortgage, $366,875; cash, $150,000.

That said conveyance to Dempsey and the subsequent conveyances were for the benefit of one Johnson or his corporation, then engaged as a contracting organization on the Queens boulevard subway, for which reason the property had a peculiar and increased value to the purchaser.

That the entire property was assessed for the year 1931 at $415,000.

That the *pro rata* assessment on the part taken for the year 1931 was $45,610.

That the award of $157,000 made in a market of low values is between three and four times the assessed value, and far beyond the fair market value.

That in making this award the court did not consider the claims of the same owner for subway easements under the property taken.

SALE NO. 8, QUEENS LIST.

(Map or diagram omitted.)

The corporation states:

That on the trial of this (The Grand Central Parkway) proceeding, the appraisers for the claimant of damage parcel 61, relied in estimating their value upon a sale July 17, 1931, by the Cord Meyer Development Corporation to the Forest Hills Materials Company, Inc., of a strip of land 100 feet by about 880 feet along the northerly side of Union turnpike. From this strip the smaller and narrower strip known as damage parcel 61, which is the same length, about 880 feet, and 3.97 feet in depth on one end, and 17.81 feet in depth on the other, is taken. After the claimant introduced this sale into evidence, and his appraisers relied upon it in making their estimate of damage, the court directed the city's appraiser, who had estimated the damage at $2,192, to reappraise the damage parcel with this sale in view, and his reappraisal showed an estimated damage of $9,031.

On the subsequent trial of the Interborough Parkway proceeding — Queens County (see memorandum decision April 21, 1934) under damage parcels 162 and 163, the court there making the awards pointed out that this sale was purely fictitious, being one of a number of inter-company transactions made to create damage and avoid beneficial assessment. The strip here taken was in the hollow adjoining low land just east of the pumping station, had little usable value and the award made, $10,000, is about thirteen times the *pro rata* assessed value of the strip taken, which is $750.

The transaction offered in evidence by the claimant here and evidently relied upon by the court should together with the accompanying transactions be again exposed and laid bare and this award reduced to not more than $2,192.

CITY SALES NOS. 9 AND 10, QUEENS LIST.

(Map or diagram omitted).

|  | Square feet. |
| --- | --- |
| Total area | 638,072 |
| Area taken | 121,032 |
| Remainder | 517,040 |

The city will show:

That the entire property shown on the diagram was sold at the top of the market in 1927 for $403,000.

That the claimant bought the property, which was vacant, except a little real estate office, at public sale on April 29, 1931, for $242,350.

The court's tentative award for one-fifth of this land as of July 21, 1931, eight weeks after the purchase by the claimant and at a time when the market for Queens real estate was rapidly falling, is $96,700.

At this time the entire property was assessed at $83,700.

The tentative award here for the part taken is at the ratio of twice what was paid for it eight weeks before the taking, and six times the assessed value.

The award for one-fifth of the land exceeds the assessed value of the entire tract.

### Sales No. 11 and No. 12 on Queens List.

(Map or diagram omitted.)

The corporation counsel will show that this vacant parcel for which the court fixing the value in the low market as of June, 1931, allowed $65,000, was actually purchased by the claimant in August, 1926, for $14,500, and was assessed for the year 1931 at $14,800.

The court has here allowed for a vacant plot not well located upwards of five times the assessed value, and nearly five times what the property cost in good times.

### Sales Nos. 15 and 16 on Queens List.

(Map or diagram omitted.)

The corporation counsel contends these sales in 1926 at about fifty cents a square foot will guide the court and result in the reduction of tentative awards made as of 1931, when there was a poor real estate market for parcels not as desirable and located in the same neighborhood.

For example, for damage parcel 97 the court awarded two dollars a square foot.

### Sale No. 17, Queens List.

(Map or diagram omitted.)

The city contends that this sale for $4,000 in 1925 when property was booming in this section — the sale analyses about fifty cents a square foot — will convince the court that tentative awards made in the low value real estate market of 1931 for less desirable property in the immediate vicinity should be drastically reduced.

For example, for vacant plot, damage parcel 92, the court allowed about one dollar a square foot; for damage parcel 93 about one dollar a square foot; for damage parcel 97 over two dollars a square foot, and for damage parcel 101, a lot fronting on a dirt wagon path (Old Lotts lane) over eighty cents a square foot.

About 1926 the Wigmore Land Company purchased the so-called Wigmore tract of 801 acres bounded generally by Hillside avenue,

One Hundred and Ninety-third street, Black Stump road, and the Motor parkway and Rocky Hill road, for $4,806,000; average price $6,000 per acre, including the valuable Hillside avenue and other road frontages.

In 1928 the comptroller of the city of New York asked for public offerings of land to the city for park purposes to be taken by direct purchase. After hearings before the board of estimate and apportionment, to which many plots were offered, the city purchased on September 15, 1928, about 240 acres of the Wigmore tract — the property on the hill — sale 14 on New York list — for $1,240,000 (about), an average of $5,250 per acre.

About 1929 the city by direct purchase bought land to the north and east of the Wigmore tract for Alley Pond Park, for about $4,000 an acre.

Subsequently, in 1930, the city purchased about 175 acres, the so-called Clark estate property, adjoining the Wigmore tract heretofore bought by the city, but having much more road frontage. The price was $4,950 per acre.

Grand Central parkway goes through part of the Wigmore tract so purchased and known as Hillside Park on the south, and in addition takes in at various points part of the land of the Wigmore tract which remained after the city's park purchase.

In appearance, contour and in value this property is in every way comparable to the Wigmore purchase made by the city in 1928 except that between the date of direct purchase in 1928 and the date of vesting in this proceeding — July, 1931 — the market had gone down. Values had fallen and there were sales below the amount the city paid for the Wigmore tract, for instance, the sale of eleven acres with Black Stump road frontage adjacent to the Wigmore land to the Fresh Meadow Country Club for $4,000 an acre, made late in 1930 or early in 1931.

To mention a few of the Wigmore parcels here taken in July, 1931, which were adjacent to the tract purchased by the city for $5,250 per acre in 1928, the following are pointed out:

| Damage parcels | Area | Award | Per acre unit |
|---|---|---|---|
| 374 | 4½ acres | $85,000 | $21,000 |
| 375 | 9 acres | 200,000 | 22,000 |
| 384 | 2½ acres | 110,000 | 44,000 |
| 389 | 1½ acres | 54,000 | 34,000 |
| 411, 412, 413 and 415 | 6 acres | 42,000 | 7,000 |
| 418 | ¾ acres | 19,000 | 25,000 |
| 419 | 8/10 acre | 14,000 | 15,500 |

Several sales on the list refer to prices in certain contracts. These prices were used by claimants' experts. The Wigmore people during the good years and before the slump in the market, sold a number of lots and plots of their remaining land to the general public through the E. A. White Sales Organization. To use these prices as a basis for the value of land here taken by the city in July, 1931, is unfair, because they were made on long term installment contracts, the commissions were high, the down payment was small and when the depression came along in the fall of 1929, the contracts fell by the wayside in large numbers.

It is proper for the corporation counsel to bring out the entire history and cost and results of these contracts. It is certainly fairer to use the cash price paid by the city in the years 1928, 1929 and 1930 for adjacent property, bought for cash after public offerings.

The corporation counsel also points out that there has been but little improvement here in this section, except the construction of Grand Central parkway, since the taking in July, 1931, and that a view and inspection of the property made now with the additional information and proof at hand will, he claims, sustain his contentions.

Unquestionably, the Wallstein investigation and the new laws which resulted therefrom have saved the city millions of dollars in condemnation proceedings, and will continue to result in great savings. The city, which, when it takes title in condemnation proceedings, pays or agrees to pay the entire price or award in cash, strangely was handicapped and hampered and fogbound until the passing of the laws of 1932, which gave it an equal opportunity with claimants to present proof.

In all fairness, the corporation counsel should be given the chance he here seeks to present the proof which he claims will result in such great savings to the city. Technical objections that rather than by a notice he should have obtained an order to get the evidence, should be brushed aside.

The broad present-day doctrine announced by our distinguished, learned and experienced new chief judge of the Court of Appeals, the other day, should enlighten us here. He said, in part: "We must think for ourselves and make our laws solve the problems of today. * * * Everything is at the testing point, old landmarks no longer point the way clearly. We see as in a mist, one step enough, but on we go as we must.

"In our field of law may we prove sure and certain guides, never doubting that amidst all changes we are progressing toward a better and a brighter day."

To meet the depression and other post-war conditions the State and city very properly undertook the construction of modern parkways to furnish employment and to provide adequate facilities for motor traffic for present and future years.

The cost of these great undertakings is borne in large part by the city of New York — a very substantial part is reflected in the tax bills of the property owners of the borough of Queens.

In addition to the part payable in the yearly tax bills another part of the cost is assessed against owners along the line of this parkway which runs through a section for practically its entire length where the properties are those in the hands of home owners or owners of building lots and plots.

While the owners of property taken should be and under the law must be awarded the fair and reasonable market value of the property taken as of the date of the taking, it is but just that before the awards to be paid are finally fixed, both the property owners and the city should have every opportunity to present for consideration all the evidence available relating to values.

It is clear to the justices of this court who have sat at Special Term in Queens county that the equities in many instances representing the life savings of owners are daily being wiped out by foreclosures which since the recent stopping of Federal home loans have increased. There is no doubt that while these improvements are beneficial to owners the taxes and assessments resulting therefrom are putting a heavy and in many instances an intolerable burden upon the property owners.

Under all the circumstances, and with the knowledge that real estate values in Queens and elsewhere dropped year after year in 1929, 1930 and 1931, awards for properties far in excess of the prices paid for the same and comparable properties in the vicinity during the years of plenty — 1923 to 1928, inclusive — cannot be justified.

On the call of the motion calendar, this court indicated the matter should be referred to the learned justice before whom the condemnation proceeding is pending, whereupon counsel for the moving parties stated they had informed the learned trial justice of their intention to request a reference of this motion to him and that he replied that the court sitting in the motion part should pass upon the question.

The motion to vacate notices is denied. The examination should proceed as provided in said notices.