Irving H. Saypol, J.
The plaintiff, in 1953, owned two former Canadian warships, the “Bess Barry M.” and the “Irving Frances M.” He contracted to sell the Irving on a profit-sharing arrangement to the corporation of one Pickard for conversion and use as a refrigerated banana carrier. It was required that Mindel should deliver her in tow of the Bess from Kingston, Jamaica to Miami, Florida. Pickard was to have acted as master on the Bess but instead he secured the services of McCrory.
The defendants are the underwriters who issued their policies of insurance to the plaintiff covering the voyage ‘ ‘ from Kingston, Jamaica in tow to Miami, Florida, direct or otherwise, and for 24 hours after arrival.” Additional provisions in the policies “ Warranted Vessels and towing arrangements subject to approval by Lloyds [defendants’] surveyor, Mr. Edgar Watson prior to sailing- Kingston.” The protection afforded was described as “ Touching the Adventures and Perils which we the Assurers are contented to bear and do take upon us in this Voyage, they are, of the Seas, Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart and Countermart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and People, of what Nation, Condition or Quality soever, Barratry of the Master and Mariners, and of all other Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Goods and Merchandises and Ship, &c., or any Part thereof;”. (Cf. Saskatchewan Government Ins. Off. v. Spot Pack, 242 F. 2d 385, 386.)
Watson, the defendants’ surveyor was familiar with both ships. Having tested and inspected and directed changes and repairs, he issued his certificate of seaworthiness. The tow got under way on November 27, 1953. Boiler trouble and fresh water requirement caused an interruption in the voyage. The ships put in at the United States Naval Base at Guantanamo, Cuba, on November 30. The tow got under way again the following afternoon. There were recurring boiler difficulties. Later the next afternoon, December 2, off Cape Maisi on the northeasterly Cuban coast the Bess anchored. By 4 o’clock of the following afternoon, on completion of repairs, the order was given to heave the anchors. Within a 10-minute span, in rough weather with strong winds and heavy sea, successively, each of the two anchors was lost from parting of their anchor *250 swivels (part of the anchor chain, consisting of the basket or female and a headed bolt, the male, which turns within the basket). The wind and sea drove both vessels toward the rocky beach. Despite all efforts to stay in safe waters, the towing cable fouled, and the Irving ran up on the coral reefs and became stranded. The Bess, unable to maneuver, dropped the connecting line and headed out to sea for her own safety and remained there overnight.
The next day all attempts to pull the Irving off were unavailing. The following day the Bess proceeded alone to Miami, Florida, where upon arrival there on December 7, 1953 she was met by Captain Pickard together with Fred Hallbauer, who was the defendants’ regular agent in Miami. Hallbauer copied the ship’s log. He took statements from the master and others, examined the ship, its boilers and machinery and the male remnants of the parted swivels but neglected to have them photographed. (These swivel remnants were burned off the anchor chains about a year later by McCrory.) Hallbauer asked the master for the usual protest. (A written statement by the master of a vessel, attested by a proper judicial officer or notary, to the effect that damage suffered by the ship on her voyage was caused by storms or other perils of the sea, without any negligence or misconduct on his own part.) (Black’s Law Dictionary, 4th ed.) On December 31, 1953, further interrogation and examination were conducted in Miami by defendants’ counsel and Hallbauer. In May, 1955, one month before trial, the defendants’ expert, McCloskey, was afforded another examination of the Bess and her equipment.
The foregoing are the essential findings of fact implicit in the jury’s verdict for the plaintiff resolving the issues at the trial for the insurance proceeds; that the Irving was lost by reason of an insured peril of the sea rather than as raised by the affirmative defense, by design or connivance on the plaintiff’s part. It is a verdict which will bring the plaintiff over $350,000 for a ship which he bought for less than $20,000. (Judgment affd. without opinion 1 A D 2d 821.) Following thereon, the defendants moved to set aside the verdict and for a new trial on newly discovered evidence.' After three weeks of hearings on the motion (see Mindel v. Stewart citing [Brindizi v. Lehigh Val. R. R. Co., 214 App. Div. 400, 404], N. Y. L. J., May 13, 1957, p. 6, col. 3) and upon consideration of the record, including the Judge’s minutes of the trial, the record on appeal and the affidavits, exhibits and briefs on this motion, the court is satisfied that no sufficient showing has been made to justify the granting of another trial. *251 The controlling legal standards as to the requirements for a new trial on the ground of newly discovered evidence are quoted in Amalfi v. Post & McCord (250 App. Div. 408, 413) from Frohlich v. Zeltzer (185 App. Div. 103, 109): “ it must appear that the evidence was not and could not have been discovered in the exercise of reasonable diligence before the trial, that it is material and not merely cumulative or of an impeaching character in the sense of affecting credibility only as distinguished from having probative force by shotving a different state of facts and that on a new trial it would probably change the result. (Bonynge v. Waterbury, 12 Hun 534; Thompson v.Welde, 27 App. Div. 186; Keister v. Rankin, 34 id. 288; Hess v. Sloane, 47 id. 585; Klinger v. Markowitz, 54 id. 299) ”. (Emphasis supplied.) The strict rule with respect to cumulative evidence which was formerly applied on these applications no longer obtains. “Is it of such a character that it is likely to produce a different result on a new trial? ” (Keister v. Rankin, supra, p. 291; Markert v. Long Is. R. R. Co., 175 App. Div. 467, 472) or “ The fundamental and underlying test to be applied to a motion of this character is whether the newly discovered evidence is of such a nature and is so positive and convincing that it will, in all probability, produce a different result if a new trial is had (Collins v. Central Trust Co. of Rochester, 226 App. Div. 486; Travitsky v. Schamroth, 277 App. Div. 1018).” (Edelman v. Frindel, 9 Misc 2d 769, 773-774.)
The question then is whether or not the defendants have met the burden of showing that they have evidence positive and convincing of their affirmative defense, sufficient to establish the likelihood and probability of a different result at a new trial. The showing in their papers in support of the motion indicated four lines of attack, viz., that the male anchor remnants produced at the trial were spurious and were not in fact from the Ress; that plaintiff’s witnesses Pickard and McCrory had testified falsely in denying any interest in the lawsuit; by negating the occurrence of boiler trouble on the voyage; and again by impugning Pickard’s denial of any interest in Mindel’s lawsuit.
On final submission after the hearings the defendants concentrate most on the question of the authenticity of the plaintiff’s evidence about the parted anchors.
I am compelled to reject the testimony of the witnesses Adamski and Nowak, formerly coadventurers together with Pickard and McCrory, when they say that the latter expressed an interest in this recovery. Adamski as an investor and *252 Nowak as his Florida lawyer with a part interest in the investment, both displayed hostility toward each other and in varying degree toward Pickard and McCrory as the evident result of their unprofitable venture. Signs of motives for recrimination among the group, are apparent. Winkler was represented at the trial as Pickard’s financial backer in the latter’s arrangement with Mindel. Winkler was not produced as a witness at the trial. The contract for the sale of the ship was put in evidence by the plaintiff and its details together with the relationship between Mindel, Pickard and Winkler was touched upon in cross-examination by the defendants. Winkler was produced on the motion to contradict Pickard’s disclaimer of any interest in this recovery. It was brought out that in January, 1956, after the verdict, a criminal prosecution had been initiated against him arising from his alleged extortion attempt involving Pickard and Mindel. The criminal charge failed. The defendants now raise the additional ground that Winkler’s testimony at the hearings impugns the validity of the Mindel-Pickard contract because Winkler’s financial ability to carry out his obligation with Pickard by investment of money in Pickard’s corporation has been exposed to grave doubt. Their excuse for failing to pursue the subject at the trial is because they did not have the evidence at the time. A belated motion to examine the plaintiff before trial on this subject was pending at the time. It was not brought to the attention of the court at the time. Winkler, as a witness, from his appearance at these hearings, is one whose testimony is not to be believed. He is patently a peripatetic adventurer with assorted interests in South America, who lives by his wits, professedly from money exchange and semi-precious stone transactions, together with whatever he derives from his ventures in the sale of land and bananas. It is not unreasonable to expect that the defendants could have and should have satisfied themselves about Winkler and the worth of his contract with Pickard as it bears upon the contract between Pickard and Mindel before they took on their insurance obligations toward Mindel. Furthermore, no satisfactory reason is shown why the subject was not adequately pursued before the trial. The new testimony about boiler troubles at most is a version from two witnesses, Brown and Davies, engineers on the Bess, whose stories tend to minimize in degree but do not contradict the trial testimony about defect in the boilers.
Reverting then to the first and the most vigorously elaborated point on this motion is the question of the anchors and their parted swivels. The footnote references, summarization *253 and quotation of the trial record,* show the extensive exploration at the trial of the anchors and swivels, their genesis, history, and disputed parting. The trial record clearly depicts the detailed probing of the legitimacy of the male plugs which were plaintiff’s exhibits 20 and 21. The subject was first raised in the plaintiff’s opening and then exposed in the testimony of at least 13 witnesses on both sides, and firmly pressed in summation by both sides and in the court’s charge. Most significantly, in the midst of the trial, on the defendants’ motion over the opposition of the plaintiff, these two exhibits were ordered into the possession of defendants’ counsel over a whole week end for a purpose not then disclosed. Three weeks before the trial, as noted, the defendants had been accorded a discovery of the Bess and her equipment by their expert. Over all, the initial relationship of the parties, as insured and insurer, according to their contract was predicated upon preliminary inspection of both vessels and certification of their seaworthiness by the defendants’ agent, Edgar Watson, marine surveyor at the point of embarkation, Kingston, Jamaica. The end of the fateful episode upon the arrival of the Bess at Miami was in the presence of the defendants’ agent there, Fred Hallbauer, when he was informed particularly of the parting of the swivels. He did nothing to preserve the remaining parts of the swivel equipment.
It is with that background that the court must consider the showing on this motion on this point. The defendants produced a former master of the Bess, captain Henry Watson.' He told of his experience with her and of his familiarity with her equipment. He had last seen the Bess in January, 1953, 11 months before the disaster. Of her anchor equipment, only one had a swivel. This contradicted the testimony at the trial of the other Watson, Edgar, the defendants’ marine surveyor who certified seaworthiness. Edgar Watson had sworn in categorical denial that there were no swivels on the anchors of the Bess. To fortify his story he said that by authoritative controlling rulings of official agencies at his port, Kingston, Jamaica, swivel equipment on anchors were forbidden and if the anchors of the Bess had been so equipped he could not have issued his certificate of seaworthiness. In other words, at the trial Edgar Watson said there were no swivels on the anchors while at the recent hearings captain Henry Watson said that her equipment included one such device. Other witnesses produced by the defendants on the motion described the locating and retrieving of anchors from the sea bottom in the vicinity of the stranding. *254 One such anchor with a swivel remnant was located more than a month before the trial. A circumstantial showing is made for the inference that it was from the Bess. One of defendants’ counsel, who was present on the scene at that time, did nothing to preserve the anchor or its physical details and characteristics for prospective evidence at the trial. Quite clearly, while there was knowledge on the part of the defendants, assuming the swivel anchor to have been from the Bess, nevertheless nothing was said of the fact at the trial and they litigated on the Edgar Watson theory that the anchors had no swivels. Now on this motion it is revealed that after the trial, examination and investigation and chemical, metallurgical and mechanical tests support the expert hypothesis that the swivel parts at the trial were not equipment of the Bess’ swivel anchor equipment and therefore the trial exhibits are spurious. These opinions and the conclusion are contraverted by those of the plaintiff’s experts in their affidavits. The excuse for the failure to disclose at the trial the facts of the retrieved anchor together with the present opinions from the experts is that it disappeared shortly after being brought to the dock and efforts to find it were unproductive up to the trial. That does not excuse the defendants’ silence at the trial. Whether the turnover of the anchor exhibits to the defendants in the midst of the trial has any connection with the location of the alleged anchor from the Bess has never been explained.
In addition to the doubt whether the defendants should have a chance to try out their new theory, it is doubtful whether at a second trial the probability is that a more effective case of fabrication of exhibits could be made so as to lead to a different result. At most, all that can be said for the defendants’ showing on this motion is that there would be a more forceful yet reiterated showing of their circumstantial version disputing the plaintiff’s as to the incidents leading to .the loss of the Irving. Olear and convincing evidence of fraud by the plaintiff was not presented to the jury, as their verdict shows, nor is it now shown that the defendants can do so at a second trial.
The motion is denied. Settle order.

 Not published herewith.— [Rep.