William C. Hecht, J.
This is a motion by claimant of damage parcels 526 through 532 for an order directing (a) reconsideration and setting aside of this court’s decision (22 Mise 2d 619); (b) the taking of additional testimony; and (c) the rendering of a new decision on the grounds that said decision is contrary to the law and the evidence.
1. The first ground urged for reconsideration is 1 ‘ that the Court fixed market value as of February 28, 1958, although the actual date of vesting of title in The City of New York was October 1, 1958.” The answer to this contention is that the value of $2,205,944 found in the original decision is the value which was fixed as of the only date it could legally be fixed, namely, October 1, 1958, the date title vested.
2. The second ground urged for reconsideration is that “ the Court * * * is in error as to the substance of Mr. Witt-man’s testimony * * * with resultant mistakes in the findings. Claimant’s testimony was not that immediately upon the first taking claimant’s lands appreciated in value 50%. The citation of stenographer’s minutes page 288 is a partial statement on cross-examination of the witness’s testimony. The testimony immediately following, quoted infra, proves this.” The testimony quoted infra is from stenographer’s minutes page 289. In the light of these statements Wittman’s testimony will be analyzed at somewhat greater length than would otherwise be warranted. (All italics supplied.)
Wittman had testified that he was familiar with the proposed use by Lincoln Center, Fordham University, and Webb and Knapp of the lands included in the first taking of February 28, 1958. The following then ensued on direct examination (S. M. pp. 264-265): 11 Q. Mr. Wittman, in the light of all that we have just shown with respect to the condemnation to the south and to the west of the subject property as of February 28, 1958, the conveyances by the City to the various sponsors, in the light of the Urban Renewal Plan, as finally adopted by the Board of Estimate on November 26, 1957, the condemnation which took place pursuant to that on February 28, 1958 to the south and to the west of the claimant’s property in this proceeding, can you tell the Court what, in your opinion, was the fair and reasonable market value, taking into consideration all of the factors that you, as a real estate man, believe should be considered, of that property as of March 1,1958, the date after the first taking "l A. $4,000,000.”
*692 He then testified that the highest and best use of the land as of March 1, 1958 was either (a) an apartment house with stores on the ground floor; (b) an office building with stores on the ground floor; (c) a combination office building and hotel with stores on the ground floor (S. M. p. 266). In making his appraisal, he considered the sketches made by the witness Both ££ as reasonable projected uses of the claimant’s land as of March 1, 1958” (S. M. pp. 266-267).
The following was his testimony on cross-examination. This repeats the excerpt quoted in the previous opinion (S. M. p. 288); his ££ explanation ” of that testimony on which claimant relies on this motion (S. M. p. 289); the portion following that explanation; and the further testimony to which claimant’s moving affidavit refers (S. M. pp. 315-316).
11 Q. What would your appraisal have been of this property on February 27, 1958, before the vesting? * * * A. For land and building, as of February 28, 1958, the moment before title vested for the Lincoln Square project, my appraisal for land and building would be $2,700,000.
££ Q. So that, over night, without any physical change of any kind, without anything happening at all, your opinion of the value of that property jumped from $2,700,000 to $4,000,000? A. Ho, sir; not over night. The same day. The moment after.
“Q. The moment after? A. Yes.
££ Q. One minute after the vesting? A. That’s right.
££ Q. After the Clerk in the County Clerk’s office stamped the order as entered, immediately it went from $2,700,000 to $4,000,000? A. Hot quite.
££ Q. Two minutes after? A. Ho. I said, 1 Hot quite.’ * # * Because there were two things that happened at that moment. The City took it and immediately resold it, and very definitely there was a plan, and at that moment, there ivas a certainty that the sponsor could only put the Philharmonic Opera House [sic] in the location in which it is going. The City took it at that moment, and at that very moment reconveyed it to the sponsor who was bound, under that contract, to put that right there. And all of the other properties were, at that moment, reconveyed to their various sponsors, the Fordham University, the Metropolitan Opera House, the Webb and Knapp project, the Title"! Co-op project,— all of these things occurred at that same moment, and it is the two together that made that difference.” ('S. M. pp. 288-289.)
Besuming:
££ Q. In your opinion, if this property now being taken had been taken as part of the original Lincoln Square project, and *693 was contained in the original taking, your value of that property would have been $2,700,000? A. That’s correct.
“ Q. Based on your usual formulas of appraisal? A. That is correct.
“ Q. But now you have changed it to $4,000,000 because of what facts, Mr. Wittman? A. Because of the fact that the property across the street was not only taken but the contract had been signed for the sale thereof, with specific locations as to certain buildings and the inclusion of other buildings, but not specifically located.
“ Q. So that the facts on which you base your opinion are twofold, as I understand it now; One, the original Lincoln Square project with the sponsor and their contracts with the City; and secondly, the sales which you have submitted to the Court today and which we have analyzed? A. In addition thereto, checking out for my own purposes the reasonable residual value of the land by projecting the various best improvements to that land.” (S. M. pp. 315-316.)
Wittman’s testimony as to sales will be discussed under Item 3, where it will be seen that they do not support his $4,000,000 valuation. Barring these sales, the only basis for his appraisal is the anticipated income from one of the three proposed “highest and best uses ” of the land, each of which was projected on the certainty that the Philharmonic, the Metropolitan Opera House, Fordham University and the Webb and Knapp project would all be expected in close proximity to claimant’s property.
As noted in the previous decision, these expectations were subject to many “ ifs ”. This was recognized by claimant’s witness Both, an architect, who testified that “we do about $80,000,000 worth of construction each year, our own office. We probably do more than all the other architects put together ” (iS. M. p. 208). Claimant’s brief (p. 24) describes him as “ a man who obviously knows more about what is going on in the market place in Manhattan in lai'ge scale construction than any other man in the courtroom.” Both testified- that the value of three alternative projects which he had sketched out (apartment house, apartment hotel or office building) was dependent on the completion of the Lincoln Center project. His testimony was ( S. M. pp. 211-212):
“ Q. Will you assume that the entire project as it is planned now goes by the boards and the City of New York has this land recaptured and doesn’t proceed with this project as it’s planned now. Would you say, then, that the apartment house and the hotel and the office building which you have sketched would have *694 the same value as they have if the contracts are performed? A. No, they would not,
“ Q. In other words, your sketches are based upon the fact that the contracts will be complied with and that the Lincoln Square Center for Performing Arts will eventually be there in three or four year si A. That’s right.”
He testified further that he could not predict labor or material or lending costs or conditions or taxes at that time (S. M. pp. 202-203):
“ Q. Can you tell me and the Court what labor conditions will be two or three or four years from now before the Lincoln Square area is completed? A. No, sir, I cannot.
‘ ‘ Q. You wouldn’t know what the building material conditions might be? A. No.
“ Q. You don’t know whether there would be an increase in labor costs or a decrease, do you? A. No.
“ Q. And you don’t know whether there would be an increase in material costs or a decrease? A. No.
“ Q. And you don’t know whether there would be an increase in lending costs, either way, up or down? A. No.
“ Q. And there is no way of your telling now what the taxes on the property by the City would be within the next three or four years? A. No.”
But Wittman completely disregarded this possibility. His testimony, previously quoted, shows that he equated the mere signing of the contracts with the certainty that the projects would be completed. After he had established a value based on that assumption, his theory was that the city could attack that value only by showing that a default had actually occurred and no new sponsor had taken up the commitment. His testimony follows (S. M. pp. 290-291):
“ Q. * * * Would your opinion of value have risen to $4,000,000 from $2,700,000 if you felt in any way that the sponsors might, as possible in life, default in the contracts which they made with the City to improve the Lincoln Square project? A. I think that would have to be a fact rather than a hypothesis to the same degree that while I answered your question that a moment before the talcing of Lincoln Square it was two million seven, and a moment after, it was four million, I knew the moment before that Lincoln Square would be taken, that the value in fact, did not jump until it had been taken, and by the same token, if there was a default, the default would have to occur and no new sponsor come to the fore before there would be a detriment in that. Merely the fact that there is a potential or a possibility of a default does not make that value *695 less. It makes it four. When it is built, it will be more than four.”
This strikes me as a novel method of trying to sell real estate. From hearing the foregoing testimony and observing the demeanor of the witnesses, I do not believe that any reasonably prudent real estate buyer would have paid more than $2,200,000 for claimants’ property on October 1, 1958, on the basis of a presentation by Wittman and Both in the language of their testimony before me. Certainly, the city should not be required to pay more.
The court’s rejection of Wittman’s method of valuation is supported by the very case relied on by claimant, United States v. 25.406 Acres of Land (172 F. 2d 990 [C. 0. A., 4th Cir.]). In that case, the facts were as follows (p. 992): “ There was evidence showing that an apartment hotel and eight apartment buildings had been completely planned, that arrangements had been made with the Equitable Life Assurance Society to finance the undertaking, and that one of the leading construction firms of the country had agreed to undertake the construction, which could have been commenced within thirty days of the time when the property was taken. The testimony in question, therefore, related not to the nebulous cost of constructing a vague, hypothetical project and the estimated income to be derived therefrom, but to the cost and expected income of a project which, according to the evidence, was definitely in the process of achievement.” (Italics supplied.)
In short, the court there was presented with a situation exactly like that in Mattydale Shopping Center v. State of New York (303 N. Y. 974) discussed in the original decision herein. That its language has no application to Wittman’s testimony here is shown by this further excerpt from the opinion (172 F. 2d, supra, p. 994): “ We do not mean to say, of course, that an expert witness should be allowed to roam at large in realms of fancy and testify at length about hypothetical developments and mythical income to be realized therefrom. When this is attempted it should be firmly suppressed because of its tendency to mislead and confuse and the waste of time involved. Nothing of this sort, however, is involved here. The development as to which testimony was allowed was one which had been carefully planned in detail before the taking by the government and one which would have been carried out but for the taking(Italics supplied.)
3. The third ground for reconsideration is that “ the Court has misread Mr. Wittman’s testimony. Mr. Wittman valued the claimant’s property at $4,000,000 on the taking date and in *696 determining Ms opinion of vaMe, he considered all of the facts which any reasonable real estate man or any willing buyer and seller in the market place would consider, including the Broadway sales wMch took place after February 28, 1958 when the highest and best use of claimant’s land had completely changed. He testified that he considered the sales which had taken place subsequent to February 28, 1958 in the determination of his $4,000,000 value (S. M. pp. 263-265, 291-292).”
The cited pages and claimant’s Exhibit CO indicate that Wittman considered seven sales, six of which were in the area east of Central Park, and therefore are not remotely relevant to value on Broadway between 65th and 66th Streets. He considered one Broadway sale, that of 1861-1869 Broadway, sold on May 8,1958 for $840,000. But a single sale is not enough to establish value.
4. The fourth ground for reconsideration is that ‘ ‘ the Court of Appeals has specifically held, with reference to the LincoM Square project, that on February 28, 1958, the very date in issue here, in the very project in issue here, that values did change solely by reason of the change in highest and best use of the properties conveyed by the City, and that there were two market values at 62nd Street and Columbus Avenue as of February 28, 1958 solely as a result of the change in the contemplated use of the land, none of the contemplated improvements necessarily being in existence ”, citing 64th St. Residences v. City of New York (4 N Y 2d 268).
That holding does not support claimant’s contention here, as is shown by the following excerpt from Judge Desmond’s opinion (supra, pp. 275-276): “ Plaintiffs say that the condemnation of this land and the sale thereof to the university is completely void because Fordham is a denominational school and the sale to it, according to plaintiffs, at $7 per square foot of land for which the city will pay an estimated cost of about $16 per square foot would thus be an unconstitutional grant or subsidy of public moneys to a religious corporation. The argument, however, proceeds on an assumption false in fact. Plaintiffs say that because the city * * * will pay for it, this necessarily amounts to a subsidy or gift. But what the city is buying is not the same as what Fordham is buying. The city buys land and buildings. Fordham buys the same property but subject to its agreement to raze the buildings, relocate the tenants and use the cleared land for a collegiate campus and buildings only. What Fordham is paying for is the re-use value of the land. There is in tMs record no dispute of the fact, found by both courts below, that the $7 per square foot which Fordham agreed *697 to bid, and did bid, is at least equal to the re-use value as established by several appraisals, all of which reported figures lower than $7 per square foot. Therefore, there is no substance to the assertion, on which this whole suit depends, that Fordham is getting a gift, grant or subsidy of public property.”
In that case the court held that the value of the land decreased after the taking because its use was limited, and its ownership was subjected to certain burdens, that is, demolition of the buildings and relocation of tenants.
5. The fifth ground for reconsideration is that the court has misinterpreted United States v. Miller (317 U. S. 369). Ordinarily, alleged errors of law should be reviewed by appeal. However, since the allegation of error has been pressed with great persistence, I have reread the Miller case and carefully reviewed claimant’s arguments. The original interpretation is adhered to, but some amplification may be appropriate.
In that case the original taking occurred on August 26, 1937, while the taking of claimant’s property occurred on December 14, 1938. The District Judge confined claimant’s witnesses to testifying as to “ market value at the date of the taking, excluding therefrom any increment of value occurring after August 26,1937, due to the authorisation of the project ” (p. 372; italics supplied). He charged the jury “ that, in arriving at market value as of the date of taking, they should disregard increment of value due to the initiation of the project and arising after August 26, 1937” (p. 373; italics supplied).
The Circuit Court of Appeals mistakenly thought that: ‘ ‘ The court ruled that no evidence could come in as to sales of similar properties after August 26, 1937, and that qualified witnesses testifying as to the value of the land on the date of the taking must subtract from this valuation any increment in value after August 26, 1937” (p. 373; italics supplied). In short, the appellate court overlooked the fact that the Trial Judge excluded only increment of value accruing due to the authorization or initiation of the project. “ A majority of the Court [of Appeals] were of opinion the witnesses should have been asked to state the fair market value of the lands as of the date of taking, without qualification” (p. 373; italics supplied).
The Supreme Court reversed the judgment of the Circuit Court of Appeals and affirmed the judgment of the District Court. In that case, the evidence showed that there had been an increment in value due to the project. “ In 1937, subdivisions were plotted and there grew up a settlement known as Boom-town, in which the [claimant’s] lands lie. * * * By December 1938 the town had been built up for business and residential *698 purposes ” (p. 371). Therefore, since an increment of value had occurred between the two takings, the witnesses and the jury had to be restricted to whatever increment (if any) resulted from causes other than the project.
In the case at bar, there is no evidence of any increment in value between February 28, 1958 and October 1, 1958, except Wittman’s testimony. The one sale in this area to which he testified is not enough to establish- value. The balance of his testimony dealt with the projected buildings; “It involved so much of the elements of uncertainty and speculation as to be inadmissible as proof of any fact ” (Matter of City of New York [Blackwell’s Is. Bridge], 118 App. Div. 272, 274 [1st Dept.]). Nothing in the Miller case requires giving any credence or weight to such testimony.
In the previous decision I interpreted the Miller case to hold that “ the proximity of the public improvement may be considered as enhancing the value of adjacent lands only after the former is actually erected on the land taken.” Claimant construes this as a holding that it ‘ ‘ would not be entitled to the benefit from the proximity of the Lincoln Center until the completion of the improvements on the project land. * * * if claimant’s lands had not been taken on October 1, 1958 and then were taken two years later when the Lincoln Center improvements were three quarters finished, that no increase in value due to the proximity of the project could accrue to claimant as a matter of law but that when completed the increase in value would suddenly occur.”
That is a misconception of what the previous decision said. If the improvements were actually erected but only three quarters finished, it would be possible to establish by relevant and competent evidence an increase in the value of adjacent lands. This would be shown by more than one sale in the area or by a development which had been completely planned and which a responsible lender had agreed to finance, as in United States v. 25.406 Acres of Land (172 F. 2d 990, supra); or by a project which reached the stage of filed plans, actual bids for construction and executed leases, as in Mattydale Shopping Center v. State of New York (303 N. Y. 974, supra). Nothing remotely resembling that has been shown here. No one has been willing to invest any real money or assume a binding commitment as the basis of Wittman’s “imaginary and speculative proposition and mere visionary theories ” (Bronx Riv. Parkway Comm. v. Mayer, 179 N. Y. S. 792, 794).
6. The sixth ground for reconsideration is that the court misapprehended the successive steps which resulted in deferring *699 the second taking until October 1, 1958. I find no reason for departing from the analysis of this contention in the previous decision.
The court said in Miller (317 U. S., supra, p. 379): “ If [ claim-_ ant’s lands] were within the area where they were likely to be taken for the project, but might not be, the owners were not entitled, if they were ultimately taken, to an increment of value calculated on the theory that if they had not been taken they would have been more valuable by reason of their proximity to the land taken. In so charging the jury the trial court was correct.” That principle applies to the factual situation here.
7. The ground urged for the taking of additional testimony is to introduce evidence of the resale of 1861-1869 Broadway in January, 1959.
Even though this sale was four months after valuation date, it would have been considered if offered at the trial (People ex rel. Four Park Ave Corp. v. Lilly, 265 App. Div. 68 [1st Dept.]; People ex rel. Horwitz v. Miller, 267 App. Div. 897 [1st Dept.]; United States of America v. 63.04 Acres of Land, 245 F. 2d 140 [C. C. A., 2d Cir.]). There is no question about the power of the court to exercise its discretion by reopening the ease for the taking of additional testimony (Matter of the City of New York [Union Turnpike], 268 N. Y. 681). The difficulty with claimant’s position here is that it has offered no reason for the exercise of such discretion.
The Union Turnpike case (supra) affected 499 damage parcels, the tentative awards for which aggregated over $6,000,000 (154 Misc. 455, 456). The testimony was taken between November 16 and December 11, 1931. At that time, testimony of sales was not permitted in order to establish value in condemnation (ibid., pp. 459-461).
The problem was the subject of an extensive investigation by Mr. Wallstein. His investigation resulted in the enactment of chapter 391 of the Laws of 1932 (eff. March 23, 1932), which added section 1000-a to the New York Charter, permitting evidence of such sales (268 N. Y., supra, pp. 681-682). The beneficent effect of that new statute was discussed by Chief Judge Cardozo in Matter of Edge Ho Holding Corp. (256 N. Y. 374, 378-379).
The city sought to take advantage of this new statute by introducing evidence of 137 sales, which Justice Lockwood found were extremely pertinent in determining the value of the 499 parcels before him (154 Misc., supra, pp. 463-470). He granted the motion to reopen for the purpose of introducing this testimony, saying (pp. 461,470): “ The Grand Central Parkway *700 proceeding was tried in 1931, before the new statutes were enacted, under the adverse condition just referred to and thus the city was at a great disadvantage. Now before it is too late the corporation counsel seeks to turn on the light which he asserts will bring out facts showing clearly that the awards are largely in excess of the fair and reasonable market value. * * * Unquestionably the Wallstein investigation and the new laws which resulted therefrom have saved the city millions of dollars in condemnation proceedings, and will continue to result in great savings. The city which, when it takes title in condemnation proceedings, pays or agrees to pay the entire price or award in cash, strangely was handicapped and hampered and fogbound until the passing of the laws of 1932, which gave it an equal opportunity with claimants to present proof.”
This decision was affirmed (243 App. Div. 811 [2d Dept.], affd. 268 N. Y. 681). But neither of the factors which impelled Justice Lockwood to reopen the case exists here.
No excuse is offered to show why evidence of this sale, which occurred in January, 1959, could not, with reasonable diligence, have been obtained for use at the trial in October, 1959. The previous sale of this property in May, 1958, was introduced by claimant’s witness Wittman. It is hard to understand why an expert would not have followed up to see the ultimate outcome of the only sale in this area. The moving affidavit merely states that claimant’s attorney learned of this resale only in January, 1960, without explaining the year’s delay on his part and the part of Ms expert.
In Collins v. Central Trust Co. of Rochester (226 App. Div. 486 [4th Dept.]), the court said (pp. 487-488):
“It is well settled that to entitle a party to a new trial on the ground of newly-discovered evidence, it must appear that such evidence could not, with reasonable diligence, have been obtained for use on the first trial [citing numerous cases].
* * Parties are supposed to prepare their cases for trial. If they fail so to do and are defeated, they are not entitled to another trial. They have no one except themselves to blame for the result. There should be some end to litigation. The Constitution gives to all litigants their day in court, and a fair and impartial trial, but it does not assure them two days in court. The moving affidavits are absolutely silent as to any efforts wMch the defendants made to obtain this newly-discovered evidence before the trial.”
The court there reversed an order granting a new trial on the ground of newly discovered evidence. Thereafter defendants made a second motion for a new trial, based upon the *701 same evidence plus the additional newly discovered evidence. The second motion was likewise granted and likewise reversed (229 App. Div. 363). The court said (pp. 365-366):
“We think that this motion should be denied for another reason. Before a defeated party is entitled to a new trial upon the ground of newly-discovered evidence, he must show that he used reasonable diligence to prepare the case for trial, and was unable to discover the new evidence. One seeking a new trial must show that he made timely inquiries in the proper quarter. The court is the judge of what constitutes due diligence, and not the party or his attorney. The court’s idea on that subject might be entirely different from that of the defeated party, who, naturally, is biased. The facts constituting the diligence exercised by the movant must be stated. General averments, or the conclusions of the defeated party, or his attorney, are not sufficient.
# * #
“ The only affidavits which touch upon the attention which was given by the defendants to the preparation of this case for trial are those of counsel for respondents and an officer of the defendant trust company. Neither affiant states any facts as to what he or any one else did to discover this alleged newly-discovered evidence before the trial; both content themselves with stating their conclusion that they made reasonable and diligent efforts to discover all the evidence bearing upon the case. They do not tell us of whom they inquired, or what they did to prepare the case for trial. We are not bound to accept their idea as to what constitutes due diligence in the preparation of the case for trial. We cannot help but think that, if any reasonable effort had been made, all this evidence which the defendants now seek to produce could have easily been discovered before this action was tried.”
This proposition was restated with approval in a recent condemnation case, Matter of Huie (City of New York) (2 Misc 2d 40, 43, affd. on opinion of Taylor, J., at Special Term, 2 A D 2d 631 [3d Dept.]).
A second reason why the motion to reopen should not be granted is that claimant has not proved that it would change the result. As previously stated, one sale, even two sales (here of the same property) in this area does not establish value. As was said in Matter of Huie (supra) (2 Misc 2d, supra, p. 44) : “ There is another reason which, in my view, requires the denial of the motion. Whether the newly discovered evidence is of such a nature and is so positive and convincing that it *702 would in all probability produce a different result if new trials were had is open to a serious doubt. It is not enough simply to show that a different conclusion might be reached on another trial (Tarbell v. Finnigan, 55 App. Div. 629, 631.) ”
(See, to the same effect, Mindel v. Stewart, 10 Misc 2d 248, 251-254, affd. 5 A D 2d 810 [1st Dept.]; Edelman v. Frindel, 9 Misc 2d 769, 773-774, McNally, J.; Collins v. Central Trust Co. of Rochester, 226 App. Div. 486, supra.)
The condemnation proceeding affecting Lincoln Square and the Lincoln Square Addition has occupied the time of this court for over a year. Five hundred thirty-two damage parcels were involved, including innumerable contested fixture claims. The trial of the subject property required six days. Voluminous briefs were submitted. If a defeated litigant were permitted to reopen such a proceeding to get a second trial for the presentation of evidence which could and should have been presented on the first trial, the business of this court could not be properly carried on.
During the course of the trial certain evidence was received by the court with a reservation on motions to strike such evidence. While I believe the decision clearly indicates the evidence was considered by the court, to remove any doubt, all motions on which decision was reserved are denied.
The motion is denied in all respects. The trial of the fixture claim will be had at a time to be agreed upon by the parties.